UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> KENNETH HARLAN, <br><br> *Defendant*. | No. 24 Cr. 630 (LGS) |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT KENNETH HARLAN'S MOTION TO SEVER**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 5

BACKGROUND ................................................................................................................... 7

    I.     MobileFuse Enters Into Strategic Partnership with Near ................................................. 8

    II.    Near Goes Public and The Near Executives' Fraud is Uncovered .............................. 12

    III.  Procedural History .................................................................................................... 15

LEGAL STANDARD ........................................................................................................... 16

ARGUMENT ...................................................................................................................... 17

CONCLUSION .................................................................................................................... 21

## **TABLE OF AUTHORITIES**

**Cases**                                                                                                                          **Page(s)**

*United States v. Bin Laden*,
    160 F. Supp. 2d 670 (S.D.N.Y. 2001)...................................................................................18

*United States v. Black*,
    918 F.3d 243 (2d Cir. 2019)..............................................................................................19

*United States v. Byrd*,
    466 F. Supp. 2d 550 (S.D.N.Y. 2006)..........................................................................17, 20

*United States v. Contreras*,
    216 F. Supp. 3d 299 (W.D.N.Y. 2016)..............................................................................17

*United States v. Daughtry,*
    No. 09 Cr. 1132 (DAB), 2011 WL 724668 (S.D.N.Y. Feb. 25, 2011).........................16, 17

*United States v. Gambino*,
    59 F.3d 353 (2d Cir. 1995)................................................................................................17

*United States v. Gouveia*,
    467 U.S. 180 (1984)...........................................................................................................19

*United States v. Kozeny*,
    No. 05 Cr. 518 (RCC), 2006 WL 8446936 (S.D.N.Y. Nov. 15, 2006) ............................18

*United States v. MacDonald*,
    456 U.S. 1 (1982)..............................................................................................................19

*United States v. Medina*,
    13 Cr. 272 (S.D.N.Y. Apr. 23, 2014)......................................................................16, 19, 20

*United States v. Nachamie*,
    101 F. Supp. 2d 134 (S.D.N.Y. 2000)........................................................................16, 17

*United States v. Nordlicht*,
    No. 16 Cr. 640 (BMC), 2018 WL 1796542 (E.D.N.Y. Apr. 16, 2018)............................19

*United States v. Pena*,
    793 F.2d 486 (2d Cir. 1986)........................................................................................16, 17

*United States v. Rosa*,
    11 F.3d 315 (2d Cir. 1993)................................................................................................16

*United States v. Shkreli*,
    260 F. Supp. 3d 247 (E.D.N.Y. 2017) ..............................................................................19

*Zafiro v. United States*,
        506 U.S. 534 (1993)............................................................................................16

*Doggett v. United States*,
        505 U.S. 747 (1992)............................................................................................19

## **Statutes, Rules, and Regulations**

15 U.S.C. § 78ff............................................................................................................15

15 U.S.C. § 78j(b) ........................................................................................................15

18 U.S.C. § 371............................................................................................................15

18 U.S.C. § 3161..................................................................................................16, 17

Fed. R. Crim. P. 14 .....................................................................................................16

Defendant Kenneth Harlan respectfully submits this Memorandum of Law in support of his motion, pursuant to Federal Rule of Criminal Procedure 14, to sever his trial from those of his co-defendants, Anil Mathews and Rahul Agarwal.

## PRELIMINARY STATEMENT

Mr. Harlan moves to sever his trial from that of his co-defendants Anil Mathews and Rahul Agarwal (the "Near Executives"), who perpetrated a massive fraud not only against the investors in their company, Near Intelligence, Inc. ("Near"), but against Mr. Harlan and his company, MobileFuse. Mr. Harlan was a victim, not a perpetrator, of the Near Executives' accounting fraud. Mr. Harlan now seeks to exercise his rights under the Sixth Amendment and the Speedy Trial Acy to a speedy trial to clear his name and to avoid further damage that the government's erroneous charges have done—and continue to do—to his life and reputation.

On August 7, 2025, the government unsealed a superseding indictment (the "Indictment") alleging that Mr. Harlan, previously the CEO of MobileFuse, conspired with the Near Executives to engage in purported roundtrip transactions to fraudulently inflate Near's revenue ahead of its initial public offering in March 2023. Contrary to the Indictment's allegations, Mr. Harlan expects the evidence at trial will show that the payments at issue were made pursuant to two real contracts executed years before Near's IPO and were supported by actual economic substance. Under these Agreements, Near and MobileFuse entered into a strategic partnership through which they jointly executed real mobile advertising campaigns, for real clients, that generated real economic value. Mr. Harlan was open and transparent about this partnership and the payments at issue, including with MobileFuse's employees, outside counsel, outside accountant, external auditor, and bankers.

Throughout the companies' partnership, which lasted from approximately 2020 through 2023, Mr. Harlan believed in good faith that Near, like MobileFuse,[1] was properly accounting for its revenue and expenses resulting from the transactions at issue. Indeed, Mr. Harlan expects the evidence at trial will establish that Near, like MobileFuse, could have properly and transparently accounted for the transactions with MobileFuse under the relevant accounting standards. This undermines the government's mistaken and superficial theory that the transactions were "sham" roundtrips. Unbeknownst to Mr. Harlan, however, the Near Executives were fraudulently misrepresenting and manipulating Near's financials to make the company's financial performance appear stronger than it actually was. Moreover, the fraud centered not on inflating Near's revenues (although those were inaccurately reported, too), but on concealing the companies' agreement that governed Near's payments to MobileFuse and misrepresenting the nature of Near's expenses associated with the partnership. Not only were Mr. Harlan and MobileFuse misled by the Near Executives, but so too were Near's auditors who, unlike Mr. Harlan, had full access to Near's books and records.

Mr. Harlan was arraigned on August 7, 2025 and pleaded not guilty. Following Mr. Harlan's arraignment, the government produced voluminous Rule 16 discovery and certain *Brady* material to Mr. Harlan's counsel. Mr. Harlan and his counsel retained an accounting expert to help them review the discovery and prepare Mr. Harlan's defense. Even with substantial resources devoted to reviewing and analyzing the discovery, this process took approximately eight months.

Until very recently, neither of Mr. Harlan's co-defendants had appeared in this case. For the past 18 months, Mr. Mathews has been pending extradition from France. On May 1, 2026,

---

[1] The Indictment does not allege that MobileFuse's accounting treatment for the transactions at issue in this case was improper, inaccurate, or misleading in any way.

Mr. Mathews made his initial appearance and pleaded not guilty to the Indictment. Meanwhile, Mr. Agarwal is a fugitive believed by the government to be in India. The government has acknowledged that it is unlikely that Mr. Agarwal will remain on the same trial schedule as either Mr. Harlan or Mr. Mathews.

Although Mr. Mathews has now been extradited and has appeared in this case, his counsel will still likely need a significant amount of time to review the discovery, potentially retain their own expert, research and file any pretrial motions, and prepare for trial.[2] It would be unfair and contrary to the interests of justice to require Mr. Harlan to sit in limbo for months—with unresolved charges that continue to harm his business, his reputation, and his ability to support his family—while Mr. Mathews prepares his own defense. This is all the more true since it is unclear whether Mr. Mathews will, in fact, go to trial and, if he does, whether he will seek to sever his trial from that of Mr. Harlan. To preserve Mr. Harlan's right to a speedy trial and to clear his name as soon as possible, Mr. Harlan respectfully requests that his trial be severed from that of Mr. Mathews (and Mr. Agarwal) and be scheduled for the fall of 2026.

## **BACKGROUND**

This case arises from certain payments exchanged by MobileFuse and Near in connection with their strategic partnership between 2020 and 2023. The Indictment erroneously alleges that these payments were fraudulent roundtrips. They were not. As discussed further below, Mr. Harlan expects that the evidence at trial would show that the payments, which arose from a legitimate commercial partnership, were supported by genuine economic substance and could have been completely proper from an accounting perspective had the Near Executives accurately accounted for and transparently disclosed them in their financials. While it is now clear that

---

[2] On May 1, Mr. Mathews was detained without prejudice to a future bail application pending trial. ECF 44. Mr. Mathews' detention will likely hinder his counsel's ability to review the discovery and discuss this case with him, which will prolong the time needed for Mr. Mathews and his counsel to prepare for trial.

instead of doing so the Near Executives brazenly cooked the books and tricked their auditors, the evidence will show that Mr. Harlan was unaware of their accounting fraud at the time. The evidence will also show that neither Mr. Harlan personally, or MobileFuse as a company, benefited financially from the Near Executives' accounting fraud. Instead, the evidence will show that Mr. Harlan and MobileFuse were victims of the Near Executives' fraud and that the Indictment is flat out wrong about the nature of the transactions at issue. As set forth below, the actual details of the companies' partnership—rather than the distorted picture painted by the Indictment—demonstrate Mr. Harlan's innocence and show why further delaying Mr. Harlan's trial would be contrary to the interests of justice. Any interest that the government might assert in jointly trying Mr. Harlan with his co-defendants is vastly outweighed by Mr. Harlan's compelling interest in a speedy trial.

## I.  MobileFuse Enters Into Strategic Partnership with Near

Mr. Harlan founded MobileFuse in 2009 to provide its clients (brands and ad agencies) with solutions for placing digital advertisements on mobile devices. *See* Indictment ¶ 7. MobileFuse works with these clients to design and place advertisements on digital devices (the "demand-side"), and builds relationships with publishers, like app developers, who are selling advertising space (the "supply-side"). MobileFuse connects these advertisers and publishers by deploying both its internal technology, as well as third parties' technology, to help clients' advertisements reach the right audience at the right time. MobileFuse then tracks and measures whether those advertisements were effective. After MobileFuse's founding, MobileFuse successfully grew its client and publisher base year after year.

In 2019, Mr. Harlan was introduced to Mr. Mathews and Mr. Agarwal, Near's Chief Executive Officer and Chief Financial Officer, respectively. *See* Indictment ¶¶ 6, 18. From their initial meeting onwards, Mr. Harlan understood Near to be a well-capitalized, venture-backed

technology company with significant outside investment and established operations. MobileFuse and Near offered complementary services that operated at different points of the mobile advertising ecosystem. While MobileFuse has a role in both the demand and supply sides of the ad tech industry, and operates its own exchange called "MFX" that connects advertisers and publishers through an online auction to buy and sell ad space, it lacks its own demand-side platform, or "DSP," which allows advertisers to actually buy digital ad space. This meant that, historically, MobileFuse needed to spend a large amount of its clients' advertising dollars on third parties' technology, including DSPs and data management platforms ("DMPs"), which use audience data to target advertisements, in order to execute ad campaigns for its clients. For its part, Near operated a DSP called "Engage" and a highly sophisticated DMP called "Allspark," which used troves of consumer data to target digital advertisements to a highly tailored audience. MobileFuse's and Near's offerings were complementary: MobileFuse needed access to Engage and Allspark, while Near needed access to MFX and MobileFuse's client and publisher base in the United States.[3] Mr. Harlan viewed Allspark, in particular, as a potential gamechanger for MobileFuse's business. Accordingly, Mr. Harlan sought to secure exclusive access from Near to use Allspark in the United States, which Mr. Harlan anticipated would be highly attractive to existing and potential new clients of MobileFuse.

Between late 2019 and early 2020, Mr. Harlan and the Near Executives engaged in arms-length negotiations to create a strategic partnership that would capitalize on their respective technologies. The purpose of their partnership was to enable the companies to work collaboratively to deliver digital advertisements to highly tailored audiences via mobile devices. Under the deal structure, which was proposed by the Near Executives, MobileFuse and Near

---

[3] At the time that MobileFuse and Near entered into their strategic partnership, Near did not operate in the United States.

9

entered into two coterminous agreements that worked in tandem and governed the services and payments exchanged between the companies:  the Services Agreement, which set forth the services that MobileFuse would provide to Near, and the Allspark Agreement, which set forth the services that Near would provide to MobileFuse (collectively, the "Agreements").[4]  Prior to executing the Agreements, which represented significant contracts for MobileFuse, Mr. Harlan sent the Agreements to MobileFuse's outside counsel for review.

In March 2020, the parties executed the Agreements.  Pursuant to the Allspark Agreement, MobileFuse received an exclusive right to use Near's products in the United States in exchange for directing at least $15 million per year of ad spend by MobileFuse's clients to Near's platforms, which increased at the end of June 2021 to at least $18 million per year in ad spend.  Thus, MobileFuse was initially required to pay Near $1.25 million per month, which increased to $1.5 million per month after June 2021.  Pursuant to the Services Agreement, MobileFuse agreed to provide Near with access to its ad exchange, MFX, and to provide publisher and inventory management, advertising operations, and creative design.  The Services Agreement was non-exclusive; Near could choose to route ad spend through MFX or, alternatively, through MobileFuse's competitors' ad exchanges.

Beginning in early 2020, and continuing for more than a year, teams from both MobileFuse and Near devoted significant time and resources to integrating the companies' technologies and building out Near's capabilities to meet MobileFuse's technical requirements.  On March 31, 2021—approximately one year after the Agreements were signed—the companies went "live" with their partnership (referred to as the "Go Live Date").  Following the Go-Live Date, the two agreements functioned together as follows.

---

[4] Despite the fact that the payments at issue were governed by *two* separate contracts, the Indictment nowhere references the Services Agreement, which set forth the services that MobileFuse provided to Near and the contractual basis for Near's payments to MobileFuse.

First, MobileFuse received orders from its clients who wanted their ad campaigns to utilize Allspark.  MobileFuse retained approximately 30% of the clients' total media spend as an upfront margin for managing the ad campaign.  After taking this upfront margin, MobileFuse was obligated under the Allspark Agreement to pay the remaining funds (the "gross media spend") to Near to place the mobile ads through Allspark and Engage.  Allspark was used to curate highly tailored audiences for the clients' advertisements and Engage was then used to place bids based on the ad campaign's specifications through MFX or another third-party ad exchange.  The ad exchange would conduct auctions to match the advertiser's "bids" with "ad requests" from publishers who had available advertising space for sale on mobile apps.  When Near used MFX (rather than a competitor ad exchange) to place its bids, Near was obligated under the Services Agreement to return approximately 90% of the gross media spend to MobileFuse; Near kept the other 10% as payment for its Allspark and Engage services.  MobileFuse would then pay the publishers approximately 70% of the remaining gross media spend for use of their advertising space, and retain approximately 30% as payment for its MFX and supply-side services.  Over the course of their approximately three-year partnership, MobileFuse and Near executed hundreds of mobile advertising campaigns for clients this way, generating billions of ad impressions from consumers.

In May 2021, the parties exchanged the first set of invoices and wire transfers due under the Agreements.  Over the course of their partnership, MobileFuse and Near conducted regular reconciliations to "true up" the amounts owed by each company for the actual services that they supplied each month.  While the amount that MobileFuse paid to Near each month was fixed under the Allspark Agreement, the amount that Near paid to MobileFuse varied based upon the actual amount of ad spend that was processed through Near's platforms and whether Near used MFX or a different third-party ad exchange.  Specifically, the parties calculated the amount that Near had

11

to pay MobileFuse by adding together: (1) the fees that Near owed to MobileFuse under the Services Agreement (*i.e.*, 90% of the actual gross media spend that Near processed through MFX); and (2) any shortfall—if there was one—between the target ad spend amount under the Allspark Agreement (initially $1.25 million per month and later $1.5 million per month) and the actual ad spend.  The difference between the two wire amounts represented the net margin that Near was entitled to retain.  As Mr. Harlan's accounting expert will testify, these transactions did not constitute roundtripping because they were supported by economic substance.  Moreover, the reconciliations that the parties conducted—which were used to ensure that the final amounts paid and received by each company were based on actual economic activity—supported Mr. Harlan's reasonable understanding that MobileFuse and Near were both properly accounting for the transactions under the Allspark and Services Agreements.

As further proof of his good faith, the evidence at trial will show that Mr. Harlan made no efforts to conceal the Agreements or the transactions with Near from anyone inside or outside of MobileFuse.  Mr. Harlan involved other MobileFuse employees in the reconciliation process, such that they were aware of the MobileFuse and Near deal structure and payment amounts.  Mr. Harlan never instructed these employees not to share the relevant contracts or details with others.  Furthermore, Mr. Harlan disclosed MobileFuse's partnership and transactions with Near to MobileFuse's auditors, outside accountants, and bankers.  In short, Mr. Harlan never hid anything about MobileFuse's partnership with Near or the payments at issue because, from his perspective, there was nothing to hide.

## II.    Near Goes Public and The Near Executives' Fraud is Uncovered

On March 24, 2023, three years after MobileFuse and Near entered into the Agreements, Near went public through a reverse merger with KludeIn I Acquisition Corp., a special purpose

acquisition company, or "SPAC." *See* Indictment ¶ 5.[5] In the leadup to the IPO, Near had to prepare audited financials to provide to the SEC and potential investors. Mr. Harlan's sole interaction with Near's audit was to, at the request of Near's external auditor, sign audit confirmations that accurately reflected the amounts owed at the time from MobileFuse to Near under the Allspark Agreement. Mr. Harlan had no control or influence over Near's internal accounting decisions or the information that Near provided to its external auditor, and did not participate in Near's SPAC negotiations, SEC filings, or investor communications. Without Mr. Harlan's knowledge, however, the Near Executives appear to have concealed the Services Agreement and reconciliations from Near's auditor and caused the revenues and expenses from its partnership with MobileFuse to be misrepresented in the company's financials used in connection with the IPO.

Over the six months prior to Near going public, Mr. Harlan had grown increasingly frustrated with the Near Executives' lack of professionalism and responsiveness, as well as with glitches with Near's technology. In August 2023, Mr. Harlan terminated MobileFuse's partnership with Near. On October 5, 2023, Near announced that its revenue may have been overstated and that its financial statements could not be relied on. Indictment ¶ 3. In December 2023, less than nine months after it went public, Near filed for bankruptcy. *Id.* ¶¶ 3, 5.

Throughout MobileFuse and Near's partnership, Mr. Harlan reasonably believed, in good faith, that Near—like MobileFuse—was properly accounting for and disclosing the transactions at issue. While MobileFuse recognized the transactions with Near on a net basis, *see* Indictment ¶ 27, Mr. Harlan reasonably believed, based on his understanding of accounting practices in the

---

[5] Mr. Harlan learned about Near's plan to go public in September 2022 at the earliest. The Indictment fails to articulate how Mr. Harlan could have reached a meeting of the minds with the Near Executives to defraud Near's investors in connection with the IPO when the Agreements that governed the payments at issue were negotiated *years before* Mr. Harlan even knew of Near's plan to go public.

advertising technology industry,[6] that Near could recognize the amount of ad spend that MobileFuse paid to it under the Allspark Agreement on a gross basis as long as it was booking the offsetting costs under the Services Agreement—thereby accurately recognizing and reporting the resulting net margin.[7]   Indeed, the Near Executives affirmatively led Mr. Harlan to believe that Near was properly reporting its expenses.[8]

Mr. Harlan anticipates that his accounting expert's testimony would support the reasonableness of his belief.  He expects his expert to testify that Near could have reported the revenue that it received from MobileFuse on a gross basis as long as Near was complying with relevant accounting standards and accurately reporting its offsetting expenses.  Mr. Harlan also expects his expert to testify that the audit confirmations that he signed related to the funds due under the Allspark Agreement were accurate.  Unbeknownst to Mr. Harlan, however, Near was not offsetting its gross revenues with the expenses under the Services Agreement and was not accurately reporting those expenses in its financials.  And that was not all.  Without Mr. Harlan's knowledge, the Near Executives, among other things, also: falsified millions of dollars in revenue from MobileFuse (at least some of which Near recognized *before* the Go Live Date); shifted $12.5 million of Near's 2021 and 2022 expenses under the Services Agreement back to 2020 to increase Near's net margin in the two years leading up to its IPO; and concealed the Services Agreement and related payments to MobileFuse from Near's auditors.  The Near Executives engaged in this

---

[6] Recognizing revenue on a gross basis is common in the advertising technology industry. *See, e.g.*, Viant Technology Inc., Annual Report (Form 10-K) at 91 (Mar. 10, 2022) (reflecting that Viant Technology, a public company that offers services similar to Near's, reports some revenue and related costs on a gross basis); Magnite, Inc., Annual Report (Form 10-K) at 46 (Feb. 23, 2022) ("With respect to certain revenue streams for managed advertising campaigns that are transacted through inserted orders, we report revenue on a gross basis.").

[7] The trial evidence will demonstrate that Mr. Harlan's communications about the fact that Near was accounting for its revenues from its transactions with MobileFuse on a "gross" basis—cited in the Indictment as reflecting evidence of Mr. Harlan's knowledge of wrongdoing—actually reflect his understanding that the structure of the deal and the payments were permissible under relevant accounting standards.

[8] For example, on May 20, 2021, when the companies exchanged their first set of invoices due under the Agreements, Mr. Agarwal represented to Mr. Harlan that Near had "set MobileFuse up as a customer and vendor in the SAP master."

accounting fraud in order to make the company's financial performance appear much better than it was ahead of its IPO—all without Mr. Harlan's knowledge, let alone his knowing and willful participation.

## III.   Procedural History

On August 7, 2025, the Indictment was unsealed against Mr. Mathews, Mr. Agarwal, and Mr. Harlan.  ECF 7.  The Indictment charges Mr. Harlan with one count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, *see id.* ¶¶ 38-46.  Mr. Harlan was arraigned the same day and pleaded not guilty.  ECF 13.

Since Mr. Harlan's arraignment, the government has produced voluminous discovery, consisting of approximately 694 gigabytes of data and 1.4 million pages of documents, including electronic communications and financial records.  Over the past nine months, Mr. Harlan, his counsel, and his accounting expert have diligently reviewed the discovery material.

On April 19, 2026, Mr. Harlan's counsel filed a letter with the Court asserting Mr. Harlan's intention to exercise his Sixth Amendment and statutory rights to a speedy trial and requesting that the Court schedule a trial in the summer of 2026 and enter an expedited pretrial schedule.  ECF 37.  Counsel also stated that, if necessary, Mr. Harlan was prepared to file a motion to sever his trial from that of Mr. Mathews and Mr. Agarwal.  *Id.*   On April 20, the government opposed Mr. Harlan's request.  *See* ECF 39.[9]   On April 21, the Court held a pretrial conference and indicated that it was considering setting a trial date in the fall of 2026.  Tr. at 14.  The Court further

---

[9] The government's opposition is directly contrary to its previous position when it pressed for a trial date as early as this summer.  On December 16, 2025, the government conditioned its consent to Mr. Harlan's request to adjourn his pretrial motions deadline on Mr. Harlan's agreement to a 2026 trial date.  *See* Ex. A.  On December 23, 2025, Mr. Harlan's counsel filed a consent letter with the Court, stating that "the government requests that the Court set a trial date in 2026" and that both parties were available in July, October, November, and December 2026.  ECF 25.  In that letter, Mr. Harlan's counsel expressed—consistent with their current position—that Mr. Harlan preferred a July 2026 trial date.  *Id.*

stated that if Mr. Harlan sought to sever his trial from that of his co-defendants then a motion should be filed. *Id*. This motion followed.

## LEGAL STANDARD

Federal Rule of Criminal Procedure 14(a) provides that a court may sever defendants' trials "[i]f the joinder . . . of defendants in an indictment, an information, or consolidation for trial appears to prejudice a defendant." Fed. R. Crim. P. 14(a). A district court "enjoys broad discretion in determining whether to sever a criminal proceeding," and its decision of whether to sever trials is "virtually unreviewable." *United States v. Daughtry*, No. 09 CR. 1132 (DAB), 2011 WL 724668, at *3 (S.D.N.Y. Feb. 25, 2011); *United States v. Nachamie*, 101 F. Supp. 2d 134, 152 (S.D.N.Y. 2000). While there is a preference for "the joint trials of defendants indicted together," a district court may sever defendants "if there is a serious risk that a joint trial would compromise a specific trial right of the moving defendant." *United States v. Rosa*, 11 F.3d 315, 341 (2d Cir. 1993) (citing *Zafiro v. United States*, 506 U.S. 534, 537–8 (1993)), *abrogated on other grounds by United States v. Crawford*, 541 U.S. 36 (2004). The court may sever a defendant's trial when there is a risk that delay caused by one defendant will prejudice a co-defendant, such as by compromising their right to a speedy trial. *See* Order at 5-8, *United States v. Medina*, 13 Cr. 272 (S.D.N.Y. Apr. 23, 2014), ECF 115 ("*Medina* Order"); *see Daughtry,* 2011 WL 724668, at *4-5; *Nachamie*, 101 F. Supp. 2d at 151-52.

The Speedy Trial Act provides that trial must begin "within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs." 18 U.S.C. § 3161(c)(1). There is one speedy trial clock in multi-defendant cases, unless a defendant is severed. *United States v. Pena*, 793 F.2d 486, 489 (2d Cir. 1986). A district court may exclude a "*reasonable* period of delay when the defendant is joined for trial with a

16

codefendant as to whom the time for trial has not run and no motion for severance has been granted.'"  18 U.S.C. § 3161(h)(6) (emphasis added); *see also Pena*, 793 F.2d at 489.  The Second Circuit has suggested that reasonableness is judged from the totality of the circumstances.  *See United States v. Gambino*, 59 F.3d 353, 362 (2d Cir. 1995).  To the extent that "[Section] 3161(h)(6)'s reasonableness limitation is not satisfied, it may be appropriate to sever [a defendant] on speedy trial grounds."  *United States v. Contreras*, 216 F. Supp. 3d 299, 303 (W.D.N.Y. 2016).

## ARGUMENT

Mr. Harlan is innocent.  He wishes to invoke his constitutional and statutory rights to a speedy trial in order to clear his name as soon as possible.  The Court should sever Mr. Harlan's trial from those of his co-defendants because, under the totality of the circumstances, any further delay of Mr. Harlan's trial attributable to them would be unreasonable and deprive Mr. Harlan of his right to a speedy trial.[10]

Courts routinely sever trials where, as here, there is a risk that one co-defendant's needs threaten to delay trial for another defendant.  *See, e.g.*, *United States v. Byrd*, 466 F. Supp. 2d 550, 551  (S.D.N.Y. 2006) (granting severance where one defendant would experience extended delays resulting from the government's consideration of whether to seek the death penalty for five of his co-defendants); *Daughtry*, 2011 WL 724668, at *4 (denying motion for reconsideration of court's decision severing defendant's trial to "allow [a co-defendant] one last opportunity to obtain counsel," which would have otherwise delayed the trial); *Nachamie*, 101 F. Supp. 2d at 151-52 (severing defendants' trials when one co-defendant's counsel became unavailable due to a scheduling conflict that would have otherwise resulted in a three-month delay); *United States v.*

---

[10] The government has essentially conceded that Mr. Harlan's trial should not be further delayed because of Mr. Agarwal's absence.  *See* ECF 19; Tr. at 6 (stating that "[c]andidly we have little expectation of getting [Mr. Agarwal] here in the near future, and we are not asking the Court to take his status into consideration with respect to anything related to the schedule.").  Thus, following discussion focuses on why the Court should sever Mr. Harlan's trial from that of Mr. Mathews.

17

*Bin Laden*, 160 F. Supp. 2d 670, 673 (S.D.N.Y. 2001) (explaining that the district court severed defendant's trial from his four co-defendants' trial because defendant's newly-assigned counsel would not have been prepared for trial in a matter that involved "voluminous discovery materials"). Mr. Harlan faces significant additional delay if his trial is not severed from his co-defendants' cases and, during that time, will experience additional irreparable harm as a result of his inability to clear his name.

Here, even assuming Mr. Mathews proceeds to trial,[11] Mr. Harlan's case will be unreasonably delayed because Mr. Mathews and his counsel will in any even need many months to prepare for trial. There is voluminous discovery in this case, consisting of approximately 694 gigabytes of data and 1.4 million pages of documents. Mr. Harlan, his counsel, and a retained accounting expert have sifted diligently through the discovery material to prepare for Mr. Harlan's defense, but that review *still* took approximately eight months. The discovery material itself is complex and consists of, among other material, each company's internal financial records; bank and wire transfer records; audit workpapers; and extensive electronic communications. Beyond this case's complex financial and accounting issues, the mobile advertising industry itself is a highly technical field that requires significant time to master. New counsel for Mr. Mathews just entered an appearance on the record on April 30. ECF 43. The practical reality is that Mr. Mathews and his new counsel will require a similar amount of time—if not more—to receive,

---

[11] Mr. Mathews may very well elect not to proceed to trial. *Cf. United States v. Kozeny*, No. 05 Cr. 518 (RCC), 2006 WL 8446936, at *1 (S.D.N.Y. Nov. 15, 2006) (setting trial date without co-defendant who was pending extradition, in part, because "even if [the co-defendant] is extradited, there is no guarantee that he will proceed" to trial).

review, and analyze the discovery;[12] contemplate pretrial motions;[13] and prepare for trial.[14] Subjecting Mr. Harlan to such further delay—particularly where he has pleaded not guilty and expressed his adamant desire to proceed to trial to clear his name—is not "reasonable." *See Medina* Order at 5-6 (granting severance where defendant "repeatedly and consistently expressed his desire to go to trial as soon as possible" and trial would have otherwise been delayed a year to accommodate co-defendant's counsel's schedule); *cf. United States v. Black*, 918 F.3d 243, 255 (2d Cir. 2019) ("post-accusation delay approaching one year may be considered presumptively prejudicial") (citing *Doggett v. United States*, 505 U.S. 747, 652 n.1 (1992)).

Mr. Harlan has a compelling interest in resolving the erroneous charges that the government has brought against him promptly. *See United States v. Gouveia*, 467 U.S. 180, 190 (1984) (the speedy trial right exists "to protect an individual's liberty interest, to 'minimize the possibility of lengthy incarceration prior to trial, *to reduce the lesser, but nevertheless substantial, impairment of liberty imported on an accused while released on bail, and to shorten the disruption of life caused by arrest and the presence of unresolved criminal charges.'*") (emphasis added) (quoting *United States v. MacDonald*, 456 U.S. 1, 8 (1982)). The charges against Mr. Harlan— which are unsupported by the record—has damaged his business, caused reputational harm, and

---

[12] As of the date of this motion, the government has not represented whether it has produced any discovery to Mr. Mathews.

[13] As described above, given the fact that Mr. Harlan's trial strategy will stress that he was a victim of, rather than a knowing and willful participant in, the Near Executive's fraud, it seems likely that Mr. Mathews will file a motion to sever to avoid "double prosecution" by the government and Mr. Harlan's counsel. *See, e.g.*, *United States v. Nordlicht*, 16 Cr. 640 (BMC), 2018 WL 1796542, at *2 (E.D.N.Y. Apr. 16, 2018) (severing co-defendant's trial where "[h]is inclusion in a joint trial would essentially make his co-defendants face prosecution on two fronts: one attack brought by the Government, and another leveled by [his co-defendant]"); *United States v. Shkreli*, 260 F. Supp. 3d 247 (E.D.N.Y. 2017) (severing co-defendant where "[a] joint trial would place on [defendant] an unfair and heavy burden in defending himself against both the government and [co-defendant]"). Were Mr. Mathews to file a motion to sever, this would, of course, further delay Mr. Harlan's trial.

[14] Mr. Mathews and his new counsel will likely require more time than Mr. Harlan and his counsel needed because Mr. Mathews must defend against additional charges in the Indictment, including wire fraud and aggravated identity theft arising from alleged separate criminal activity in which Mr. Harlan is not accused of being involved. *See* Indictment ¶¶ 47–50.

impacted his ability to work and support his family.  Mr. Harlan should not be compelled to sit in limbo—compromising his right to a speedy trial and to present his fulsome defense—because Mr. Mathews' case is on a separate track as a result of the government's failure to secure his timely extradition.

Mr. Harlan's interest in resolving the charges against him promptly outweighs any benefit to the judicial system and the government that would flow from trying Mr. Harlan and Mr. Mathews together.  The government represented that it will require only two weeks to present its case-in-chief, and counsel for Mr. Harlan has indicated that if there is a defense case, it will require less than a week.  *See* Tr. at 8, 11-12.  Given that trial is expected to only last a few weeks, the government will not be prejudiced by having to try its case twice if, and when, Mr. Mathews is prepared to go to trial.  *See Byrd*, 466 F. Supp. 2d at 553 (rejecting the government's argument that it would be "prejudiced by having to try its case twice" because "the expected trial length in [the] case is only a few weeks"); *Medina* Order at 7-8 (discounting the government's argument that a "severance would result in inefficiency and duplication" in order to preserve defendant's right to a speedy trial).

Accordingly, the Court should sever Mr. Harlan's case from that of Mr. Mathews (and Mr. Agarwal) pursuant to Federal Rule of Criminal Procedure 14, to prevent Mr. Harlan from suffering the prejudice that would result from the deprivation of his right to a speedy trial.

## CONCLUSION

For the foregoing reasons, this Court should grant Mr. Harlan's motion for severance.

Dated:  New York, New York
      May 4, 2026

Respectfully submitted,


By: */s/ Daniel S. Noble*
Daniel S. Noble
Nicholas J. Lewin
Jessie-Lauren Pierce
Ross H. Gitlin
KKL LLP
350 Fifth Avenue, 77th Floor
New York, New York 10118
(212) 390-9550

*Attorneys for Kenneth Harlan*

21

# EXHIBIT A

| | |
|---|---|
| **From:** | Daniel Noble (KKL) |
| **To:** | Nichols, Allison (USANYS); Chiuchiolo, Nicholas (USANYS) |
| **Cc:** | Nick Lewin (KKL); Patricio Martinez (KKL) |
| **Subject:** | RE: US v. Ken Harlan, S1 24 Cr. 630 (LGS) |
| **Date:** | Monday, December 22, 2025 6:25:00 PM |
| **Attachments:** | 2025.12.19 K. Harlan Adjournment Request.pdf |

Alli and Nick – Just wanted to follow up to see if you have any proposed changes to our letter to Judge Schofield or if you're OK with us filing?  We'd like to file tomorrow, if possible.

Thanks,
Dan

**From:** Daniel Noble (KKL)
**Sent:** Friday, December 19, 2025 11:03 AM
**To:** 'Nichols, Allison (USANYS)' <Allison.Nichols@usdoj.gov>; Chiuchiolo, Nicholas (USANYS) <Nicholas.Chiuchiolo@usdoj.gov>
**Cc:** Nick Lewin (KKL) <Nick.Lewin@KKLllp.com>
**Subject:** RE: US v. Ken Harlan, S1 24 Cr. 630 (LGS)

Alli and Nick – Attached is the letter we propose to file with Judge Schofield regarding our 60-day adjournment request and the government's request for a trial date.  Of the trial dates you proposed, we are not available in June, but all of the other dates work for us.  That said, if there is going to be a trial, we'd prefer to have it in July rather than later in the year.  That preference is reflected in the letter.

Please let us know if you have any proposed changes or if you're OK with us filing the letter.

Best,
Dan


**Daniel S. Noble**
KKL
350 Fifth Avenue | New York, NY  10118
212.390.9555 (w) | 202.641.5769 (c)
Daniel.Noble@KKLllp.com | www.KKLllp.com


**From:** Nichols, Allison (USANYS) <Allison.Nichols@usdoj.gov>
**Sent:** Tuesday, December 16, 2025 9:50 AM
**To:** Daniel Noble (KKL) <Daniel.Noble@KKLllp.com>
**Cc:** Nick Lewin (KKL) <Nick.Lewin@KKLllp.com>; Chiuchiolo, Nicholas (USANYS) <Nicholas.Chiuchiolo@usdoj.gov>

**Subject:** RE: US v. Ken Harlan, S1 24 Cr. 630 (LGS)



**\*\* EXTERNAL EMAIL \*\***

Dan,

Following up on our call from Friday, no objection to a two-month adjournment of the pretrial motion schedule.  As discussed, we suggest that you represent in your letter that the parties jointly request the court set a trial date for 2026.  We are available June, July, October, November, and December.

As we also discussed, let us know if there is other information you would like us to have as we consider your request for a meeting to discuss the charges in the indictment.  In particular, it would be helpful for us to understand what your accounting expert reviewed and what he or she concluded.

Thanks,
Alli

---

**From:** Chiuchiolo, Nicholas (USANYS) <Nicholas.Chiuchiolo@usdoj.gov>
**Sent:** Thursday, October 2, 2025 10:25 AM
**To:** Daniel Noble (KKL) <Daniel.Noble@KKLllp.com>; Nichols, Allison (USANYS) <Allison.Nichols@usdoj.gov>
**Cc:** Nick Lewin (KKL) <Nick.Lewin@KKLllp.com>; Patricio Martinez (KKL) <Patricio.Martinez@KKLllp.com>
**Subject:** RE: US v. Ken Harlan, S1 24 Cr. 630 (LGS)

Sounds good.  Thanks.

---

**From:** Daniel Noble (KKL) <Daniel.Noble@KKLllp.com>
**Sent:** Thursday, October 2, 2025 7:31 AM
**To:** Chiuchiolo, Nicholas (USANYS) <Nicholas.Chiuchiolo@usdoj.gov>; Nichols, Allison (USANYS) <Allison.Nichols@usdoj.gov>
**Cc:** Nick Lewin (KKL) <Nick.Lewin@KKLllp.com>; Patricio Martinez (KKL) <Patricio.Martinez@KKLllp.com>
**Subject:** [EXTERNAL] RE: US v. Ken Harlan, S1 24 Cr. 630 (LGS)

Thanks, Nick.  How about next Thursday, 10/9, at 11:30 am?  If that works, we'll send an invite.

Dan

---

**From:** Chiuchiolo, Nicholas (USANYS) <Nicholas.Chiuchiolo@usdoj.gov>

**Sent:** Wednesday, October 1, 2025 4:39 PM
**To:** Daniel Noble (KKL) <Daniel.Noble@KKLllp.com>; Nichols, Allison (USANYS) <Allison.Nichols@usdoj.gov>
**Cc:** Nick Lewin (KKL) <Nick.Lewin@KKLllp.com>; Patricio Martinez (KKL) <Patricio.Martinez@KKLllp.com>
**Subject:** RE: US v. Ken Harlan, S1 24 Cr. 630 (LGS)

**\*\* EXTERNAL EMAIL \*\***

Hi Dan,

Hope all is well.  How's Tuesday or Thursday before noon?

Nick

**From:** Daniel Noble (KKL) <Daniel.Noble@KKLllp.com>
**Sent:** Wednesday, October 1, 2025 3:35 PM
**To:** Nichols, Allison (USANYS) <Allison.Nichols@usdoj.gov>; Chiuchiolo, Nicholas (USANYS) <Nicholas.Chiuchiolo@usdoj.gov>
**Cc:** Nick Lewin (KKL) <Nick.Lewin@KKLllp.com>; Patricio Martinez (KKL) <Patricio.Martinez@KKLllp.com>
**Subject:** [EXTERNAL] US v. Ken Harlan, S1 24 Cr. 630 (LGS)

Alli and Nick –

I hope you both are doing well.  We were recently retained by Ken Harlan to represent him in this case.  We were wondering if you might have some time next week for a phone call to discuss his case with us?   It shouldn't be a long call and we're happy to work around your schedules.

Best,
Dan

**Daniel S. Noble**

KKL

350 Fifth Avenue | New York, NY  10118
212.390.9555 (w) | 202.641.5769 (c)

Daniel.Noble@KKLllp.com  | www.KKLllp.com

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive this message), you may not use, copy, or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail or contact KKL LLP at (212) 390-9550, and delete the message. Thank you.

This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive this message), you may not use, copy, or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail or contact KKL LLP at (212) 390-9550, and delete the message. Thank you.